E-FILED
Tuesday, 24 January, 2006  03:44:53 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

RAOUL A. HUGHES, )
)
    Plaintiff, )
)
v. ) Case No. 04-1052
)
MITSUBISHI MOTOR MANUFACTURING )
OF AMERICA, INC., )
)
    Defendant. )

# O R D E R

This matter is now before the Court on a Motion for Summary Judgment by Defendant, Mitsubishi Motor Manufacturing of America, Inc. ("MMMA"). For the reasons set forth below, Defendant's Motion for Summary Judgment [#22] is GRANTED.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the claim asserted in the Complaint presents a federal question involving alleged retaliation under Title VII, 42 U.S.C. § 2000e, et seq.

## FACTUAL BACKGROUND

Plaintiff, Raoul Hughes ("Hughes"), was hired as a supplemental worker by MMNA on June 1, 2000. On January 29, 2001, he became a full-time employee. During the majority of his employment, Hughes worked in an area of the Plant known as "T-7", which is a group of approximately 21 positions on the assembly line that assembles a portion of the vehicles. During the relevant time, Gary Scott ("Scott") was a Group Leader in T-7 and was Hughes' immediate supervisor.

On January 28, 2002, Hughes filed a charge of discrimination with the EEOC alleging that he had been the victim of racial discrimination and retaliation. He filed a second charge of discrimination on January 28, 2003, again alleging discrimination on the basis of race and retaliation. On March 12, 2003, Hughes filed a third charge of discrimination that also alleged racial discrimination and retaliation.

On July 24, 2003, Hughes was working second shift at MMNA. This shift began at 4:30 p.m. on July 24, 2003, and ended at 1:00 a.m. on July 25, 2003. At approximately 12:15 a.m., Scott called Employee Relations and asked that someone be sent to assist him with a problem with Hughes. Omar West ("West") responded to the request. While Scott and West were speaking about the problem, the assembly line went down and operation was suspended. Scott went to investigate the cause of the problem and discovered that a wrong part had been installed on one of the vehicles, allegedly by Hughes. After getting the line started again, Scott returned to his discussion with West. After receiving instructions from West, Scott returned to the line.

Scott approached Hughes and told him that he was going to be written up. Scott and Hughes had further words, and when Scott returned to where West was standing, his prescription safety glasses were not on his face. West testified in his deposition that the area near Scott's eye was red; he was holding the side of his face and staggering. West further stated that Scott said more than once that he had just been hit by Hughes. Scott told West his version of what had happened and was escorted to MMNA's medical department. An ice pack was applied to the side of his face, and pictures were subsequently taken to document any injury that may have been visible at that time. Scott

indicated that he wanted to press criminal charges against Hughes, and the police department was called.

After Scott was taken to the medical department, West removed Hughes from the line and told him that he had been accused of striking Scott. Hughes was escorted to a conference room in Employee Relations, where he was interviewed by West about the incident. A Union representative was also present for the interview. Hughes denied hitting Scott.

Two police officers arrived at the plant around the time that the second shift was ending and questioned Scott. The officers then went to the conference room and questioned Hughes. Hughes was arrested and was subsequently charged with battery.

On the evening of July 25, 2003, when the second shift returned to work, West interviewed associates Wannette Brown ("Brown"), Brian Barr ("Barr"), Kim Burns ("Burns"), Joel Castillo ("Castillo"), and Roderick Jones ("Jones"), as well as Group Leader Jeff Phelps ("Phelps"). Brown stated that she did not see the incident between Hughes and Scott take place. Barr reported that there had been some conflict between Hughes and Scott earlier in the day and that he had seen the two of them having a heated discussion but did not see either one hitting the other. Burns, Castillo, and Jones all indicated that they had not seen any part of the incident. Phelps was the employee who found Scott's safety glasses and stated that he had found them on the opposite side of the line from where Hughes had been working. West's report concluded:

> Based on the information collected during the investigation, it is clear that Associate Hughes hit GL Scott on the right side of his face. Associate Hughes stated that GL Scott must have walked into a rack. However, GL Scott was not walking when the blow occurred. GL Scott was standing while he wrote down information to support a discipline that he was going to

- 3 -

> issue at a later time. The unquestionable damage to GL Scott's glassed [sic] and [the] fact that GL Scott's glasses landed on the opposite side of the line is a clear indication that this was caused by an impact at a rate of speed faster than walking. The impact caused GL Scott's glasses to travel approximately 10 to 12 feet. There were no sharp impressions or scratches on GL Scott's glasses that would indicate that GL Scott walked into a metal rack. When Associate Hughes was being interviewed he demonstrated how he swiped his hand towards GL Scott after GL Scott placed him on notice for discipline.

On July 30, 2003, West wrote a recommendation regarding disciplinary action for Hughes. Based on his conclusion that Hughes had hit Scott and the seriousness of such a violation of the Associate Code of Conduct and Violence in the Workplace Policy, West recommended that Hughes' employment be terminated immediately. General Manager Rita Patterson ("Patterson") and Superintendent Kevin Smith ("Smith") concurred with this recommendation. West's recommendation was also reviewed by his manager, Mel Hall ("Hall"), who agreed and recommended to his superiors that Hughes be terminated immediately. Hall's recommendation was then reviewed by the General Manager of Human Resources, Mike Guttas ("Guttas"), and the Vice President of Human Resources, Curt Neal ("Neal"), both of whom agreed with the assessment/recommendation and approved Hughes' termination. Hughes was terminated on August 1, 2003.

On November 17, 2003, Hughes filed the present Complaint alleging that he had been the victim of retaliatory discharge by MMMA. MMMA has now moved for summary judgment. The matter is fully briefed, and this Order follows.

**LEGAL STANDARD**

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Celotex, 477 U.S. at 324. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

**DISCUSSION**

Title VII provides in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or

>because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). Under the direct method for proving retaliation, a plaintiff must present direct evidence of: (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two.  Rhodes v. Illinois Department of Transportation, 359 F.3d 498, 508 (7th Cir. 2004); Williams v. Waste Management of Illinois, 361 F.3d 1021, 1031 (7th Cir. 2004).  Although other formulations of a prima facie case of retaliation have been used in the past, the Seventh Circuit has recently clarified that an indirect prima facie case of retaliation requires the following showing:

>[A]n employee must demonstrate that: (1) [he] engaged in statutorily protected activity; (2) [he] performed [his] job according to [his] employer's legitimate expectations; (3) despite meeting [his] employer's legitimate expectations, [he] suffered a materially adverse employment action; and (4) [he] was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.

Hilt-Dyson v. City of Chicago, 282 F.3d 456, 465 (7th Cir. 2002), *citing* Stone v. City of Indianapolis Pub. Utils. Div., 280 F.3d 640, 644 (7th Cir. 2002); Spencer v. Thomas, 2002 WL 378179, at *3 (7th Cir. March 7, 2002); Haywood V. Lucent Tech., Inc., 323 F.3d 524, 531 (7th Cir. 2003).  In the absence of direct evidence, "failure to satisfy any element of the prima facie case proves fatal to the employee's retaliation claim." Hilt-Dyson, 282 F.3d at 465.  If the plaintiff establishes a prima facie case through the indirect method, the defendant may then come forward with a legitimate, non-invidious reason for the adverse action.  Haywood, 323 F.3d at 531.  "Once the defendant presents a legitimate non-

invidious reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual." Id.

Here, Hughes is apparently attempting to proceed solely under the direct method. He clearly engaged in statutorily protected activity when he filed the May 13, 2003, charge of discrimination and suffered an adverse employment action when he was terminated on August 1, 2003. Thus, he has satisfied the first two prongs of the analysis. MMNA argues that he cannot show a causal connection between his filing of an EEOC charge on March 13, 2003, and his termination on August 1, 2003.

Hughes first argues that the causal connection can be established based on the timing of the alleged retaliation. In support of this assertion, he contends that his protected activity includes not only the March 13, 2003, EEOC charge, but also internal complaints that he filed against Scott on April 3, 2002, October 20, 2002, and January 21, 2003. Specifically, he argues that Scott had a pattern of taking disciplinary action against him within a few weeks of the filing of each of these internal complaints. From this, Hughes concludes that the jury could draw a reasonable inference that Scott had engaged in a series of retaliatory acts against him.

This argument might be more persuasive if Scott had been the decision-maker that made the decision to terminate Hughes' employment or if there was any indication that the decision had been based on anything other than the July 25, 2003, incident. With all due respect, Hughes' argument focuses on the motives of the wrong person. Hughes has admitted that the sole claim in this case is for retaliatory discharge. Accordingly, the proper inquiry is whether the individuals who made the decision to terminate his employment acted with improper motivation. See Wade v. Lerner New York, Inc., 243 F.3d 319, 322 (7th Cir.

2001) (holding that the proper inquiry is whether, based on its investigation, the employer honestly believed and was motivated by the reasons proffered for the adverse employment action.)

A causal link between the employee's protected action and the employer's adverse action can be supported by the circumstantial evidence of a "close temporal connection." Ramirez v. Runyon, 971 F.Supp. 363, 366 (C.D. Ill. 1997).  To qualify under this standard, an employer's adverse action must follow "fairly soon after the employee's protected expression."   Paluck v. Gooding Rubber Co., 221 F.3d 1003, 1009-10 (7th Cir. 2000); McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796-97 (7th Cir. 1997); *see also* Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499 (7th Cir. 1998) (holding that as period of time between employer's adverse action and employee's statutorily protected expression lengthens, the hint of causation weakens). It is also well-established that "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." Stone, 281 F.3d at 644; Moser v. Indiana Department of Corrections, 406 F.3d 895, 905 (7th Cir. 2005).

In this case, Hughes' discharge came more than four months after his last EEOC charge or internal complaint.  The Seventh Circuit has held that a four to five month lapse between protected expression and the adverse employment action negates any causal inference based on temporal connection.  Filipovic v. K & R Express Sys., Inc., 176 F.3d 390, 398 (7th Cir. 1999) (finding four months too long); Davidson v. Midel fort Clinic, 133 F.3d 499 (7th Cir. 1998) (finding no causal inference where termination came five months after filing EEOC charge).

Moreover, even if Hughes were entitled to some causal inference based on timing, he must also demonstrate some other connection tying the events together. Hughes attempts to provide such a connection by pointing to two alleged admissions. He cites an alleged statement by Scott on the night of the incident in question that, "I guess he'll be snapping tonight. We'll get him out of here." Hughes also offers a statement by Keifran Arter ("Arter") from MMNA's human resources department in January 2003 to the effect that he thought that Hughes "better stop writing so much."

Again, Hughes has failed to offer any evidence concerning the honesty and motivation of the actual decisionmakers in the decision to terminate his employment with MMNA. *See* Wade, 243 F.3d at 322. According to the undisputed facts of this case, the decision to terminate his employment was initially made by West at the conclusion of his investigation and was based West's conclusion that Hughes had in fact hit Scott, as well as the seriousness of the violation of the Code of Conduct. General Manager Patterson and Superintendent Smith concurred with this recommendation. West's manager, Hall, recommended to his superiors that Hughes be terminated immediately. Hall's recommendation was then reviewed by the General Manager of Human Resources, Guttas, and the Vice President of Human Resources, Neal, both of whom agreed with the assessment/recommendation and approved Hughes' termination. There is no evidence in the record indicating that either Scott or Arter were involved in making this decision. Nor is there evidence suggesting that any of the above-named individuals who were involved in either the investigation or making the decision to terminate Hughes were tainted by any discriminatory or retaliatory animus toward him.

Hughes relies on Paluck v. Gooding Rubber Company, 221 F.3d 1003, 1010 (7th Cir. 2000), for the proposition that a manager's retaliatory motive may be imputed to the company. However, what that case actually holds is:

> [I]f a manager with a retaliatory motive is involved in the decision to terminate an employee, that retaliatory motive, in some circumstances, may be imputed to the company, even if the manager with the retaliatory motive was not the ultimate decision maker.

Id. This case is readily distinguishable, as the record before the Court establishes that neither Scott nor Arter were included in or played any part in the decision to terminate Hughes. Moreover, in Paluck, the supervisor alleged to have discriminatory animus had written disciplinary memoranda that were assumed to have been considered by the decisionmaker in arriving at the decision to terminate the plaintiff's employment. Id. at 1007-08, 1011. Likewise, in Dey v. Colt Construct & Development Co., 28 F.3d 1446, 1459 (7th Cir. 1994), which was cited in support of the holding in Paluck, the opinion of the allegedly discriminatory supervisor was expressly solicited and considered by the decisionmaker in making the decision to terminate the plaintiff.

Here, Hughes has introduced no evidence that even promotes a reasonable inference, much less establishes, that any of Scott's prior disciplinary decisions were considered in reaching the conclusion that Hughes should be discharged. To the contrary, the record reveals that the investigation focused solely on the July 25, 2003, punching incident, which was considered to be such a serious violation of the Code of Conduct that it warranted termination in and of itself. Thus, there is no basis for imputing any of Scott or Arter's alleged retaliatory motives to MMNA, and the alleged "admissions" offered by Hughes are unavailing.

Finally, Hughes contends that an inference of discriminatory animus can be made when the defendant lies about the reasons for its actions. In support of this assertion, he identifies several instances of alleged deception: (1) Scott repeatedly referenced a fictitious 10-11-01 "formal counseling" in order to pad his disciplinary record; (2) Scott padded his disciplinary file with a "written reminder" that was never discussed with him; (3) Scott contradicted himself as to whether he turned to the right or left before allegedly being punched; (4) on the night of the alleged incident, Scott did not tell West that someone else had improperly sequenced the parts and caused the problem that led to the line stopping, but rather placed all of the blame on Hughes; (5) Scott claimed that his glasses were picked up by Jeff Keefauver ("Keefauver"), but Keefauver denied it; (6) Scott did not tell West about Hughes allegedly working in another associate's area because he wanted to hide the fact that he had limited Hughes' work area, thus cutting his time; and (7) Scott claimed that Hughes punched him.

Once again, Hughes has misapprehended his burden in this case. Even assuming that Scott engaged in the alleged lies and deceptions, Hughes has not demonstrated in any way that any of the decisionmakers at MMNA had any reason to know of his deception or that any of them either knew or should have known that Hughes did not punch Scott on the morning of July 25, 2003. Rather, the record indicates that MMNA did not simply take Scott at his word and summarily discharge Hughes. There was a full investigation during which individuals who could have witnessed the incident or could have had information pertaining to the incident, as well as documented medical and physical evidence, were considered. Scott was excluded from conducting this investigation and was treated solely as a witness.

He was also excluded from the decisionmaking process that resulted in Hughes' termination.

The record is utterly devoid of evidence indicating that MMNA did not conduct a full and impartial investigation before reasonably concluding that Hughes was guilty of the offense charged and terminating his employment based solely on the seriousness of that offense. Where there is no evidence establishing that an employer, based on its investigation, did not honestly believe or was not motivated by the reasons proffered for the adverse employment action, a plaintiff cannot prevail. Wade, 243 F.3d at 322. Accordingly, Hughes has failed to make out a prima facie case of retaliation, and MMNA is entitled to summary judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, no reasonable jury could find in favor of Hughes on the record now before the Court, and MMMA's Motion for Summary Judgment [#22] is GRANTED. This matter is now TERMINATED, and all existing deadlines are VACATED.

ENTERED this 24th day of January, 2006.

s/ Michael M. Mihm
Michael M. Mihm
United States District Judge